## ARMIN SCHMIDT AND ANOTHER v. RONALD H. BENINGA AND OTHERS.

173 N. W. (2d) 401.

January 5, 1970—No. 41591.

478

*Robins, Davis & Lyons, Dale I. Larson,* and *Jeffrey S. Halpern,* for appellants.

*Robert W. Gislason,* for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Graff, JJ.

GRAFF, JUSTICE.*

This is an appeal from an order denying plaintiffs' motion for a new trial.

The sole question on this appeal is whether it was error for the trial court to direct a verdict for defendants at the close of plaintiffs' case.

The facts giving rise to the accident in this case are unusual. There is relatively little dispute concerning them, but the parties disagree as to what conclusions are to be drawn from such facts. The Farmers Grain Company operates a grain elevator in Marietta, Minnesota. Grain and other commodities were brought to the elevator by farmers in the locality. These products were brought to the elevator in "straight jobs"—trucks with dual wheels and front axles and with boxes ranging in size from 12 to 18 feet. Some of the grain brought to the elevator was moved out by railroad, some was ground for feed, and some was moved out by larger tractor-trailers. The elevator is laid out in an east-west direction, with the entrance at the east and the exit at the west side. The elevator was built before large-sized tractor-trailers were used for transportation.

The floor of the elevator is flat and level. It contained a scale 36 feet long and approximately 9 feet wide. The east end of the scale was 2 1/2 or 3 feet from a ramp and the west end of the scale was approximately 20 or 21 feet from the west door of the elevator. Trucks would approach the scale from the east by proceeding up a 30-foot incline which slopes approximately 20 degrees and terminates 2 1/2 or 3 feet east of the scale. A tractor-trailer whose length was in excess of the length of the scale could not be weighed in a single step. To weigh the units whose length was in excess of the scale, a two-step or a split-weighing procedure was employed. This procedure was in use for some period of time and was generally understood by the elevator employees

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

and the drivers of tractor-trailer units whose length exceeded that of the scale. The procedure was to drive the empty tractor-trailer so that first only the tractor would be on the scale. This left the trailer wheels partially resting on the east, sloped scale approach. A wooden block was then placed behind the outside front tire of the rear tandem on the right side of the trailer. This was done to eliminate any "drag" of the trailer during weighing and the trailer would be held in position by the block. After the block was in place, the trailer brakes were generally applied. After the tractor was weighed, the block would be removed and the entire unit would be driven ahead so only the trailer was on the scale. The trailer would then be weighed. It would then be loaded with grain or some other commodity and the weighing procedure would be followed in reverse. That is, the loaded trailer would first be weighed and then the tractor-trailer was backed up to the east and down the slope until the tractor was alone on the scale. The trailer would then be blocked as before and the tractor weighed. When a tractor-trailer was being weighed, there was not enough room on the left side between the elevator wall and the tractor-trailer to walk. There is no issue concerning the accuracy of this weighing procedure. The block of wood used to block the trailer was approximately 14 inches long, 8 inches wide, and 6 inches high.

After the entire loading and weighing procedure was completed, the driver, after receiving a signal by voice or hand from an employee of the elevator, would release the trailer brakes and proceed slowly forward a short distance to take the trailer weight off the block. The driver would then stop the unit and the elevator employee would take out the block. The driver would watch in his right rear-view mirror for a second signal or wait until he heard a voice signal from the elevator employee. Upon receiving such a signal, he would drive his tractor-trailer away from the elevator.

An accident occurred on the afternoon of October 13, 1964, and as a result plaintiff Armin Schmidt lost his right leg. It was

a clear day, there was no precipitation, and the surface upon which Schmidt was standing at the time of the accident was dry. Schmidt had worked at the elevator as a truckdriver and general laborer for approximately 2 1/2 years. At the time of the accident, Schmidt was 42 years old and a graduate of the local high school. His principal work before being employed at the elevator was farming, driving a school bus, and selling fertilizer. As a laborer at the elevator for 2 1/2 years, he was constantly involved and totally familiar with the split-weighing procedure used at the elevator for larger units. Until this accident the procedure had never caused any difficulty or injury. Schmidt testified with respect to the procedure for the removal of the block: "We felt there was no hazard there at all"; "[w]e considered it safe the way we was doing it"; "I never heard any complaints from anybody, from any drivers or anybody else." Schmidt was fully satisfied that it was a safe procedure and in discussions had with his coworkers and his employer all were satisfied that it was a safe procedure that involved no risk or danger.

Plaintiff Employers Mutual of Wausau has a subrogation right arising out of its payments to Schmidt as the workmen's compensation insurance carrier for Schmidt's employer, Farmers Grain Company.

Defendant Ronald Beninga was the driver of the tractor-trailer at the time of the accident. Beninga was 21 years old at the time of the accident. He began working for defendant Curtis E. Johnson as a driver of a tractor-trailer truck about the middle of September 1964. Defendant Johnson was doing business as Marietta Truck Lines and he is a defendant in this capacity as well as in his individual capacity. Johnson and Beninga are brothers-in-law.

The particular tractor-trailer driven by Beninga on the day of the accident had been loaded and weighed at the elevator at least 60 to 70 times per year. It did not differ in any material manner from the other tractor-trailer units that came to the elevator for loading and weighing. The tractor driven by Beninga

was a GMC Diesel of the snub-nose type where the driver sits above the engine. It had a wheel base of approximately 15 feet and its length would be increased by the amount of overhang in front and in back. The trailer used by Beninga was a grain type trailer about 8 feet wide and approximately 37 feet long with tandem rear wheels. The overall length of this combined tractor-trailer exceeded the 36-foot scale at the elevator. When fully loaded, as it was at the time of the accident, the tractor-trailer weighed about 73,000 pounds. Beninga had frequently driven this particular tractor-trailer. His compensation was a flat fee for every trip, depending on the distance. Beninga testified that the tractor-trailer was in good working order and was adequately equipped at the time of the accident. He had considerable experience in driving trucks, had a chauffeur's license, and was legally licensed to drive a tractor-trailer.

Beninga was familiar with the availability and use of the two outside rear-view mirrors mounted on the sides of the tractor. He was experienced in backing up different types of trucks and trailers and using rear-view mirrors during these operations For several weeks prior to the accident, he had driven this tractor-trailer to the elevator to pick up or deliver loads almost every day. It was a busy season for hauling and he was doing as much hauling as he could. He was fully acquainted with the physical facts and the general operation of the elevator and was also thoroughly familiar with the two-step or split-weighing procedure employed at the elevator in weighing tractor-trailer units which were longer than the scale. He admitted he was completely acquainted with the use of the wooden block and the procedure for removing the block during both stages of the split-weighing procedure. Beninga testified that when he was ready to proceed off the ramp after the final weighing was completed, he would be directed ahead usually by means of a hand signal and sometimes by a verbal signal from the elevator employee.

Shortly before the accident Schmidt had returned to the elevator after delivering a load of feed in the country. When he came

to the elevator, the tractor-trailer driven by Beninga was either being loaded or was practically filled. Beninga was in the office getting his weight or scale ticket and Schmidt was waiting for him to come out, so he could pull the block out and Beninga could leave. Schmidt saw Beninga come out of the office and walk around the front of the tractor to get in. Beninga released the brakes on the trailer and by means of the right rear-view mirror saw Schmidt down by the block. Schmidt was waiting on a platform a step down from and adjacent to the approach and bent over slightly to grab hold of the block with both hands. The amount of the block behind the tire was about 8 inches. Schmidt put his hands on the part of the block that was not behind the tire and said, "All right." Beninga admits receiving a signal from Schmidt at this point. Beninga stated that this signal meant that Schmidt was ready to pull the block out and that Beninga should pull ahead slowly and continue moving, which he says he did. Beninga was aware of the fact that the block had to be removed before he could proceed. The tractor-trailer started to move forward. Schmidt began to pull the block and removed about 4 or 5 inches of the block. At that point the block was apparently propelled outward by the outside rear tandem tire and struck Schmidt between the ankle and knee of the right leg. No one saw the block come out and hit Schmidt. The distance between the two outside tandem wheels was approximately 12 to 13 inches measured at the height of the block and approximately 18 to 20 inches at ground level. The distance between the back end of the block and the nearest portion of the next tire was 5 or 6 inches.

Beninga testified that he was aware that the only way he could know that the block was removed was to watch in his right rear-view mirror. Beninga states after looking in his right rear-view mirror and seeing Schmidt by the block, he never looked in his right rear-view mirror again until after the accident.

The deposition of Beninga was taken on June 15, 1967, and the trial of this case commenced on October 16, 1967. As a part of his cross-examination at the trial, some of the questions and

answers in the deposition were read to Beninga and he admitted that such questions were asked of him and he gave such answers. These answers were to the effect that he was aware of the customary procedure employed in weighing as was described at the trial. As to the signal he stated as follows:

"Well, the guy with the block would have signaled me with an arm signal to move ahead and then stop, and he would remove the block and wave me ahead, to go on ahead."

As to the second stop, the questions and answers were as follows:

"Q   And you actually saw Mr. Schmidt come into that rear view mirror range and get down there and get hold of that block, is that right?

"A   Yes, sir.

"Q   And then as he was holding onto this he what, waved with one hand, signaling you to go ahead?

"A   Yes, sir.

"Q   And that was the only signal he gave you, is that correct?

"A   As I remember it.

"Q   Did he give you any verbal signal or was this only a hand wave?

"A   I do not recall.

"Q   That hand wave meant to you to pull ahead slightly and stop, is that correct?

"A   Yes, sir.

"Q   In other words, you were supposed to pull far enough ahead to take the pressure off that block so he could pull it out?

"A   Yes, sir."

Counsel for defendants on redirect examination asked Beninga concerning questions asked and answers given in a subsequent part of the deposition. Here Beninga said it was not the procedure to receive a second signal to drive ahead. In answer to a question as to how he knew when to drive completely ahead he stated, "It's just—after you receive your signal and you move and make your stop or pause, you just continue on out."

In cross-examination, Schmidt was asked whether he was concerned that his hands may have slipped and caused the accident. Schmidt testified that "I feel my hands never did slip" and that he was not concerned with that possibility. Counsel for the defense then offered for impeachment purposes a four-page statement given by Schmidt on October 29, 1964, to an agent of the workmen's compensation insurance carrier for the elevator. This statement was taken when Schmidt was at General Hospital in Minneapolis and after his leg was amputated on October 21, 1964. The statement was received in evidence over objection. In this statement Schmidt stated, "I don't know why the rear wheels caught the block—maybe my hand slipped or maybe the truck went too fast—everything happened so fast it's hard to tell exactly what happened."

Plaintiffs contend that the evidence demonstrates that Beninga was negligent at the time and place in question. Plaintiffs assert that the evidence shows a failure to exercise reasonable care in the operation of the tractor-trailer. Plaintiffs further assert that Beninga failed to follow the customary procedure, which he knew or should have known that Schmidt would rely upon. Defendants' sole contention is that the evidence fails to show that any of the acts or omissions of Beninga involved a reasonably foreseeable risk of injury to Schmidt or anyone else. Plaintiffs claim that the evidence clearly meets the test of "foreseeability."

1. We have made it clear under what circumstances it is proper to direct a verdict. In Brittain v. City of Minneapolis, 250 Minn. 376, 389, 84 N. W. (2d) 646, 655, we stated the rule as follows:

"Ordinarily, it is only where there is an entire absence of evidence tending to establish negligence that a court can enter upon the province of the jury and direct a verdict for the defendant. LeVasseur v. Minneapolis St. Ry. Co. 221 Minn. 205, 21 N. W. (2d) 522. Where reasonable men may differ as to what constitutes ordinary care and proximate causal connection upon the

evidence presented, questions of negligence and proximate cause, as well as contributory negligence, are questions of fact for the jury; and it is only in the clearest of cases where the facts are undisputed and it is plain that all reasonable men can draw only one conclusion that the question of negligence becomes one of law. Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395; Sanders v. Gilbertson, 224 Minn. 546, 29 N. W. (2d) 357."

2. In Swedeen v. Swedeen, 270 Minn. 491, 496, 134 N. W. (2d) 871, 875, we said:

"In considering the claim that the trial court erred in directing a verdict for defendant, we are governed by those decisions which hold that a motion for a directed verdict should be granted only in those unequivocal cases where, in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the evidence or contrary to the law in the case. Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243; Van Tassel v. Patterson, 235 Minn. 152, 50 N. W. (2d) 113; Crea v. Wuellner, 235 Minn. 408, 51 N. W. (2d) 283. It is for the jury, not the court, to determine weight to be given to testimony and to decide what it proves. Cameron v. Evans, 241 Minn. 200, 62 N. W. (2d) 793; Zuber v. N. P. Ry. Co. 246 Minn. 157, 74 N. W. (2d) 641; Storbakken v. Soderberg, 246 Minn. 434, 75 N. W. (2d) 496. A verdict should be directed only when it is plain that all reasonable men can draw but one conclusion. Where varying inferences may be drawn from the testimony, the case should be submitted to the jury. Sviggum v. Phillips, 217 Minn. 586, 15 N. W. (2d) 109; Olson v. Evert, 224 Minn. 528, 28 N. W. (2d) 753; Audette v. Lindahl, 231 Minn. 239, 42 N. W. (2d) 717."

The credibility of the evidence and every inference which may fairly be drawn therefrom must be viewed in a light most favorable to plaintiffs upon defendants' motion for a directed verdict. See, Wm. Mueller & Sons v. Chanhassen Redi Mix, 273 Minn. 214, 140 N. W. (2d) 326; Downey v. Frey, 269 Minn. 66, 130 N. W.

(2d) 349; Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688.

3. The jury could have found that the elevator employees, including Schmidt, were working together with Beninga in so far as unloading, loading, and weighing at the elevator were concerned. If so, there would be a duty of each to the other to exercise the care and skill ordinarily employed by prudent men in similar circumstances, and there would be liability for any injury by reason of a neglect of such care or skill. The principle is stated in 13B Dunnell, Dig. (3 ed.) § 6975, as follows:

"Where several persons are engaged in the same work, in which the negligent or unskillful performance of his part by one may cause danger to the others, and in which each must necessarily depend for his safety upon the good faith, skill, and prudence of each of the others in doing his part of the work, it is the duty of each to the others engaged on the work to exercise the care and skill ordinarily employed by prudent men in similar circumstances, and he is liable for any injury occurring to any one of the others by reason of a neglect to use such care and skill."

The jury could have found that Beninga did not maintain a proper lookout. Beninga saw Schmidt at the block in his right rear-view mirror and knew that Schmidt was waiting to pull out the block. Beninga admits that he received a hand or oral signal. Beninga was fully aware that the only way he would know whether the block was removed before he proceeded was to watch in his right rear-view mirror. Beninga stated that the only way he would know whether the block was out while he was in the tractor-trailer was to look to the rear. Beninga knew that the block was there; he knew the block had to be removed before he drove off the scale; and yet he did not bother to look. The jury in considering these facts could also take into account that it was a busy season for hauling, that Beninga was doing as much hauling as he could, and that he was paid a flat fee for every trip. The unequivocal duty of a driver of a vehicle to maintain a proper

lookout is well settled whether the vehicle is on or off the highway. See, LaBelle v. Swanson, 248 Minn. 35, 78 N. W. (2d) 358; Schneider v. The Texas Co. 244 Minn. 131, 69 N. W. (2d) 329; Swanson v. J. L. Shiely Co. 234 Minn. 548, 48 N. W. (2d) 848; 13B Dunnell, Dig. (3 ed.) § 6997a. In LaBelle v. Swanson, *supra,* we held that the duty of a driver to maintain a proper lookout for workmen extends to workmen of whom the driver is not aware and with whom he is not working. We stated in that case: "A motorist's observation for the purpose of discovering hazards, which the ordinarily prudent man would reasonably anticipate, presupposes that, in the exercise of ordinary care, the observation will be taken at a time and place when it will be effective." 248 Minn. 39, 78 N. W. (2d) 362. The jury could have found that a reasonably prudent person would have looked in the right rear-view mirror at an effective time and place to ascertain that the block was removed before the driver drove off the scale.

Depending upon the circumstances in a particular case, the rate of speed, the failure to stop, and the failure to pause or slow down may constitute the lack of reasonable care. Reasonable care is that degree of care which a reasonably prudent person would exercise under the same or similar circumstances. Ahlstrom v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 1, 9, 68 N. W. (2d) 873, 879. The jury could have found that the exercise of reasonable care required that Beninga in driving the tractor-trailer should have stopped, or at the very least paused sufficiently after the pressure on the block was released. Beninga knew that he should pause or halt to give Schmidt sufficient time to remove the block. Beninga admits he did neither. The evidence as to the speed of the tractor-trailer after the first signal was given is meager. Beninga states he drove slowly after receiving the first signal. In the written statement Schmidt gave on October 29, 1964,[1] he stated, "[M]aybe the truck went too fast." The crux of

---

[1] Schmidt's testimony that he was not concerned with the possibility that his hands may have slipped was impeached by the statement.

the speed issue was whether Beninga was going slowly enough to permit Schmidt to extricate the block, and the jury could have found that the speed of the tractor-trailer after receiving the first signal was not slow enough to permit removal of the block.

4. The customary procedure for weighing large tractor-trailer units at the elevator was gone into thoroughly at the trial. The only dispute as to the customary procedure was what the driver should do after receiving the initial signal. When the evidence is viewed in the light most favorable to plaintiffs, the customary procedure was that after receiving the first signal, the driver was to relieve the pressure on the block and then stop, and then, upon receiving a second signal, was to drive off the scale. Beninga admitted that this was the customary procedure at the time his deposition was taken, and at the trial he admitted that he had so testified in his deposition. Such testimony during the trial is not merely impeaching testimony, it is the admission of a party and as such was substantive evidence which alone would be sufficient to sustain plaintiffs' burden of proof on the question of the custom. See, In Re Estate of Olson, 227 Minn. 289, 301, 35 N. W. (2d) 439, 447; Leifson v. Henning, 210 Minn. 311, 313, 298 N. W. 41, 42; Guile v. Greenberg, 192 Minn. 548, 556, 257 N. W. 649, 652.

The evidence shows that the customary procedure existed at the elevator and was known and followed by employees of the elevator and drivers, including Beninga. Beninga failed to follow the customary procedure in this instance, without any notice to Schmidt. The evidence indicates that as long as the customary procedure was followed, no difficulties had been encountered with the removal of the block. The observance of a custom or failure to observe it does not necessarily amount to due care or the lack of it, but such evidence is admissible as tending to show what a reasonably prudent person would do under the same or

---

The only foundation for its admission into evidence related to the possibility of Schmidt's hands slipping, yet the entire statement was received over objection.

similar circumstances. See, Hartmon v. National Heater Co. 240 Minn. 264, 277, 60 N. W. (2d) 804, 812; Kelly v. Southern Minn. Ry. Co. 28 Minn. 98, 9 N. W. 588; 13B Dunnell, Dig. (3 ed.) § 7049. Under the evidence the jury could have found that Beninga, by not following the customary procedure at the elevator, did not act as a reasonably prudent person would do under the same or similar circumstances. At the same time it must be recognized that the doing of a negligent act is not excused by the fact that it is customary. See, Scattergood v. Keil, 233 Minn. 340, 343, 45 N. W. (2d) 650, 653.

5. Defendants' principal contention on this appeal is that Beninga could not be found to be negligent on the evidence because there was no reasonable ground to anticipate that the acts or omissions of Beninga would or might result in any injury to anybody.

The principles relating to "foreseeability" were laid down by Mr. Justice Mitchell in Christianson v. Chicago, St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641, as follows:

"What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent, but is not at all decisive in determining whether that act is the proximate cause of an injury which ensues. If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent at all; but, if the act itself is negligent, then the person guilty of it is equally liable for all its natural and proximate consequences, whether he could have foreseen them or not. Otherwise expressed, the law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen."

In Dellwo v. Pearson, 259 Minn. 452, 456, 107 N. W. (2d) 859, 862, 97 A. L. R. (2d) 866, 870, we affirmed the rule of the

Christianson case relating to proximate cause and stated that "negligence is tested by foresight but proximate cause is determined by hindsight." We have consistently followed the Christianson rule. See, Peterson v. Truelson, 249 Minn. 530, 538, 83 N. W. (2d) 236, 241. There are many decisions relating to foreseeability and probability of injury as a test of liability for negligence. The cases relating to "unforeseeable" accidents are generally collected in 13B Dunnell, Dig. (3 ed.) § 7008, while the principles of negligence applicable generally to other accidents are collected in Id. § 6969, et seq. The parties here are in general agreement about what the rule is but differ in the conclusion to be drawn by the application of the rule to the facts.

6. At the close of plaintiffs' case, defendants made a motion for a directed verdict on the issues of Beninga's negligence, Schmidt's contributory negligence, and Schmidt's assumption of risk. The arguments on the motion were directed only to the issue of Beninga's negligence. The trial court made it clear that it was directing a verdict solely on the issue of Beninga's negligence and that it was not done on the issues of Schmidt's contributory negligence or assumption of risk. Earlier herein we called attention to Brittain v. City of Minneapolis, *supra*. That case states the rules when a verdict should or should not be directed: When reasonable men may differ as to what constitutes ordinary care upon the evidence, the question of negligence is one of fact for the jury; in the clearest of cases where the facts are undisputed and it is plain that all reasonable men can draw only one conclusion, the question of negligence is one of law.

Whenever a person is placed in such a position with regard to another that it is obvious that if he does not use due care in his own conduct he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself to avoid such injury. See, Depue v. Flatau, 100 Minn. 299, 111 N. W. 1, 8 L. R. A. (N. S.) 485. Beninga was completely familiar with the use of the block and aware of the small distance from the back end of the block to the

nearest portion of the rear tire. Beninga saw Schmidt's position at the block through his right rear-view mirror just before the first signal was given. Beninga was an experienced driver and he knew that if the block was not completely removed, the right rear tire would collide with the block. Considering the relative weights of the tractor-trailer and the block and that the tractor-trailer was moving, it seems reasonable if anything was to move as a result of the collision it would be the block. Beninga testified that if the block was not removed, "I do not believe you'd pull over it." Experienced drivers are generally aware that the end of an object impinged by the edge of a moving inflated tire on a motor vehicle will be propelled outward with some force. It is reasonably foreseeable that one may be injured in removing a block between the rear outside tires if the tractor-trailer is driven at such a speed that there is not time to get the block out. The exact manner in which Schmidt would be injured under such circumstances need not be perceived. See, Dellwo v. Pearson, *supra,* and Christianson v. Chicago, St. P. M. & O. Ry. Co. *supra.* The foregoing is deemed to be sufficient to demonstrate that reasonable men may differ as to what constitutes care upon the evidence and that the question of negligence in this case is one of fact for the jury.

For the reasons heretofore stated, a new trial must be granted.

Reversed and a new trial granted.