GILDEA, Chief Justice.
This defamation appeal requires us to strike a delicate balance between the State's interest in providing redress for citizens claiming reputational injury and the free speech protections the First *871 Amendment provides. Respondent Kurt Maethner brought this defamation and negligence action against appellant Someplace Safe, Inc., an advocacy organization for victims of domestic violence, and appellant Jacquelyn Jorud, his former wife, contending that their statements accused him of committing domestic violence. The district court granted summary judgment to Someplace Safe and Jorud, but the court of appeals reversed and remanded for trial. The court of appeals concluded that Maethner provided sufficient evidence of damages and breach of duty to warrant a trial on his claims. Because we conclude that the damages question requires a remand, and that summary judgment was properly awarded to Someplace Safe on negligence, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with our opinion.
FACTS
Kurt Maethner and Jacquelyn Jorud married in 1995, separated in 2008, and divorced in 2010. During the separation and divorce proceedings, Jorud was a client of Someplace Safe, a nonprofit organization that provides services for victims of domestic violence. A dissolution decree was issued in October 2010. That dissolution decree did not reference domestic violence. Jorud never sought an order for protection against Maethner and no criminal charges were filed against Maethner for domestic violence. After the divorce, Jorud kept "Maethner" as her legal surname, but also used "Jorud" after she remarried.
A few years after the divorce, Jorud began volunteering with Someplace Safe and speaking at community events about her experience as a survivor of domestic violence. On October 4, 2013, Jorud posted the following to her Facebook page, under the name Jacki Hansen Maethner: "By God's grace I am a survivor. Because of His love I am living with many blessings today! Domestic violence is real."
In 2014, Someplace Safe presented Jorud with a "Survivor Award" at its 35th anniversary fundraising banquet. To advertise the event, Someplace Safe issued a press release, which noted that "Jacki Maethner Jorud" would be receiving the award. Several local newspapers republished this information. Someplace Safe presented Jorud with a certificate at the banquet, which recognized her for "empowering [herself] and inspiring others to stand against violence."
After the banquet, Someplace Safe and Jorud posted pictures on Facebook of Jorud holding the award certificate. The Facebook page of Someplace Safe has over 1,000 followers. In addition, Jorud wrote an article for the fall 2014 newsletter of Someplace Safe that was published to approximately 2,500 people. The newsletter was seven pages long, with the last page containing a request for donations.
Jorud's article was approximately one page long, was signed "Jacki Maethner Jorud," and was accompanied by a photo of Jorud with her husband and stepchildren. The article did not mention Maethner by name nor did it specifically state that the domestic violence happened during Jorud's prior marriage to Maethner. Nonetheless, Maethner identifies the following statements from the article as defamatory:
• "I was asked to write a short article celebrating the fact of not just surviving domestic violence, but thriving through recovery."
• "Getting out of an unhealthy, threatening and dangerous relationship is hard. It is scary."
*872 • "I don't know if there will ever be a time when I can be certain I am no longer being stalked and watched."
• "I didn't want to live in a constant state of fear."
• "I didn't want daily conflict and fighting."
Months later, on February 1, 2015, Jorud posted the following to her Facebook page: "I, Jacki Maethner, will continue to speak out and educate against domestic violence. Neither the uncomfortableness of the subject, nor intimidation from others will keep me from speaking out. I am not just a survivor. I have learned to thrive in a life rich with blessings of LOVE, RESPECT, KINDNESS and EQUALITY."
Maethner sued Someplace Safe and Jorud for defamation. Maethner alleges that Someplace Safe defamed him by presenting Jorud with the Survivor Award at its banquet, publicizing the award in its press release and on its Facebook page, and publishing Jorud's article in its fall 2014 newsletter. Maethner alleges that Jorud defamed him by posting pictures and statements on Facebook that identified her as a survivor of domestic violence, as well as writing the article for Someplace Safe's newsletter. Although the statements did not identify him by name, Maethner asserts that a reasonable person in the community would understand the statements to refer to him because the Maethner surname is not common and his marriage to Jorud was well known in the community. Maethner further alleges that Someplace Safe was negligent in publishing the newsletter article without investigating the accuracy of Jorud's statements. Maethner requests damages for emotional harm, including anxiety, headaches, stomach aches, and difficulty sleeping. He also argues that his damages may be presumed because the statements accuse him of "criminal behavior or moral turpitude" and such statements are "deemed to be defamatory per se. "
Someplace Safe and Jorud each filed motions for summary judgment. The district court determined that there was a genuine issue of material fact as to whether the defamatory statements were "about" Maethner, even though none of the statements explicitly named him.[1]
Nonetheless, the district court granted summary judgment to Someplace Safe and Jorud on the defamation claims, concluding that (1) the statements were protected by a qualified privilege, and Maethner failed to establish a genuine issue of material fact on malice; and (2) Maethner had not shown proof of actual damages. The district court also granted summary judgment to Someplace Safe on the negligence claim, concluding that Someplace Safe did not have a duty to investigate Jorud's statements.
The court of appeals reversed and remanded. See Maethner v. Someplace Safe, Inc. , 907 N.W.2d 665, 675-76 (Minn. App. 2018). The court of appeals rejected each of the bases on which the district court relied in granting summary judgment. First, the court of appeals concluded that "the allegedly defamatory statements were not protected by a qualified privilege because they were made to raise funds for Someplace Safe and not to protect Jorud or to report a crime." Id. at 667. Next, the *873 court of appeals concluded that Maethner must prove negligence as an element of his defamation claim against Someplace Safe, and therefore, he "does not have a separate negligence claim" against Someplace Safe. Id. at 673. In addition, the court of appeals determined that Someplace Safe owed a duty to exercise reasonable care before publishing Jorud's statements, and "[w]hether Someplace Safe breached its duty of reasonable care raised a fact question for the jury." Id. at 674. Finally, the court of appeals said that "Maethner produced sufficient evidence of damages to survive summary judgment." Id. Therefore, the court of appeals remanded for trial on Maethner's defamation claims. Id. at 675-76.
Someplace Safe and Jorud each petitioned for further review. We granted both petitions.
ANALYSIS
This is a defamation case. To provide a framework for our analysis, we begin with some general principles. Under the common law, a plaintiff pursuing a defamation claim "must prove that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community."[2] Weinberger v. Maplewood Review , 668 N.W.2d 667, 673 (Minn. 2003). As the second element suggests, the common law recognizes privileges, both absolute and qualified, that operate to defeat a defamation claim. Harlow v. State Dep't of Human Servs. , 883 N.W.2d 561, 569 (Minn. 2016). A qualified privilege is overcome if the plaintiff demonstrates that the defendant made the statement with malice. Bahr v. Boise Cascade Corp. , 766 N.W.2d 910, 920 (Minn. 2009). Malice under the common law means that the defendant made the statement "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." Stuempges v. Parke, Davis & Co. , 297 N.W.2d 252, 257 (Minn. 1980) (citation omitted) (internal quotation marks omitted).
To avoid chilling constitutionally protected speech, the Supreme Court has imposed prerequisites to recovery in certain types of defamation actions. For example, the Court has held that public figures and public officials must meet a higher standard when challenging defamatory statements, requiring proof of actual malice.[3] See generally Curtis Publ'g Co. v. Butts , 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ; New York Times Co. v. Sullivan , 376 U.S. 254, 278-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). To satisfy the constitutional actual-malice standard, a statement must be "made with the 'knowledge that it was false or with reckless disregard of whether it was false or not.' " Weinberger , 668 N.W.2d at 673 (quoting New York Times , 376 U.S. at 279-80, 84 S.Ct. 710 ); see also Moreno v. Crookston Times Printing Co. , 610 N.W.2d 321, 329 (Minn. 2000) (defining "actual malice" and noting that "it is important to distinguish between 'actual malice' and 'common law malice' ").
With this framework in mind, we turn to the issues raised here. First, we address whether Maethner produced sufficient evidence of damages to survive summary judgment, including whether he may *874 rely on presumed damages. Second, we address whether Someplace Safe had a duty to investigate the truthfulness of Jorud's statements before publishing the statements. Because this case comes to us on appeal from summary judgment, we conduct a de novo review to determine "whether there are any genuine issues of material fact and whether the district court erred in its application of the law to the facts." Capistrant v. Lifetouch Nat'l Sch. Studios, Inc. , 916 N.W.2d 23, 27 (Minn. 2018). In making that determination, "we view the evidence in the light most favorable to the nonmoving party and resolve all doubts and factual inferences against the moving parties." 328 Barry Ave., LLC v. Nolan Props. Grp., LLC , 871 N.W.2d 745, 751 (Minn. 2015).[4]
I.
We turn first to the issue of damages. The damages issue presented here focuses on the third element of a defamation claim-reputational harm. Weinberger , 668 N.W.2d at 673. The district court dismissed Maethner's defamation claims on summary judgment, concluding that Maethner did not offer evidence to create an issue for trial on reputational harm. The court of appeals reversed. On appeal, Maethner argues that he offered sufficient proof of damages to survive summary judgment. He contends that he suffered emotional-harm damages as result of the defamatory statements. He also argues that he is entitled to presumed damages because his claims are for defamation per se. We consider each aspect of Maethner's damages argument in turn.
A.
We first consider Maethner's argument that his defamation claims survive because he offered proof of emotional-harm damages. Maethner asserts that he is entitled to recover damages for his emotional distress, which includes "headaches, stomach aches, difficulty sleeping, and similar ailments." Someplace Safe and Jorud argue that Maethner's emotional-harm damages are not recoverable under our decision in Richie v. Paramount Pictures Corp. , which held that "emotional damages are not compensable" in a defamation action "absent harm to reputation." 544 N.W.2d 21, 28 (Minn. 1996).
We explained in Richie that a defamation plaintiff generally must establish harm to reputation because defamation actions compensate for injury to reputation, in contrast to invasion of privacy torts, which "compensate for 'mental distress from having been exposed to public view.' " Id. (quoting Time Inc. v. Hill , 385 U.S. 374, 384-85 n.9, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ). Accordingly, we concluded that emotional-harm damages are allowed in Minnesota only as "parasitic" damages. Id. at 27. Put another way, emotional-harm damages " 'are insufficient in themselves to make the slander actionable, but once the cause of action is made out without them, they may be tacked on as "parasitic" to it.' " Id. (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 112, at 794-95 (5th ed. 1984)). Maethner does not ask us to reconsider this aspect of Richie .
Instead, on appeal, Maethner cites to his deposition where he testified that others saw the statements at issue. But, as the district court found, Maethner also testified at his deposition that he did not know *875 whether the statements at issue "had any impact on his reputation." And he "could not name anyone who thought ill or less of him because of the statements." Because Maethner did not offer evidence to satisfy the "reputational harm prerequisite" that Minnesota law imposes in defamation actions, Richie , 544 N.W.2d at 28, his defamation claims fail as a matter of law unless he can recover presumed damages. We turn to that question now.
B.
Maethner argues that he can recover presumed damages because "[a]ccusations of criminal behavior or moral turpitude, like those made here, are deemed to be defamatory per se. " In cases of defamation per se, "the common law allowed harm to reputation to be presumed." Richie , 544 N.W.2d 21 at 25. And we have held that defamation per se is "actionable without any proof of actual damages." Stuempges , 297 N.W.2d at 255. Courts allow presumed damages because statements that are defamatory per se are "virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove."[5] Carey v. Piphus , 435 U.S. 247, 262, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).
Statements that we have recognized as defamatory per se include "false accusations of committing a crime and false statements about a person's business, trade, or professional conduct." Becker v. Alloy Hardfacing & Eng'g Co. , 401 N.W.2d 655, 661 (Minn. 1987). We agree with Maethner that some of the challenged statements here, when viewed in the light most favorable to him, could be capable of being understood as accusing him of a crime-namely, domestic assault, see Minn. Stat. § 609.2242 (2018), and stalking, see Minn. Stat § 609.749 (2018).
That the statements could be construed as involving criminal behavior, however, does not end the analysis. This is because, like all laws regulating speech, the doctrine of defamation per se cannot offend the constitutional guarantees of the First Amendment. See Jadwin v. Minneapolis Star & Tribune Co. , 367 N.W.2d 476, 481 (Minn. 1985). We have recognized that "personal reputation has been cherished as important and highly worthy of protection" throughout history. Id. at 491. But at the same time, courts cannot offer recourse for injury to reputation at the cost of chilling speech on matters of public concern, which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Snyder v. Phelps , 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (internal quotation marks omitted) (quoting Connick v. Myers , 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ). We must determine how that balance between *876 cherished reputational rights and free speech protections tips here on Maethner's claim of presumed damages.
1.
The district court and court of appeals grounded their presumed-damages rulings on Richie v. Paramount Pictures Corp. , so we begin our analysis there. Richie arose from an episode of the Maury Povich Show, "a nationally syndicated television program." 544 N.W.2d at 23. The plaintiffs' goddaughter appeared on the show to discuss her successful civil suit against her parents arising out of sexual abuse. Id. at 23-24. Prior to filming, the goddaughter's attorney provided the show with a photograph, which she believed depicted the goddaughter with her parents. Id. at 24. The photograph, in fact, depicted the goddaughter with the plaintiffs. Id. The photograph was shown during the episode while the goddaughter was discussing the abuse, which suggested that the plaintiffs were the perpetrators. Id. After the show aired, the plaintiffs sued the producer of the show, the production company, and the goddaughter's attorney for defamation. Id. at 23.
In analyzing whether the plaintiffs could recover presumed damages, we described Supreme Court precedent as holding that "in a private plaintiff defamation action against a media defendant speaking on a matter of public concern, states may not constitutionally 'permit recovery of presumed ... damages, at least when liability is not based on a showing of falsity or reckless disregard for the truth.' " Id. at 25 (alteration in original) (footnote omitted) (quoting Gertz v. Robert Welch, Inc. , 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ). Applying this rule, we held that "damages cannot be presumed" and "a showing of actual harm to reputation" is required "where the defamatory statements were made by the media, involved a matter of public concern, and there have been no allegations of actual malice." Id. at 26, 28.
The district court in this case relied on Richie to conclude that Maethner could not recover presumed damages "based on the facts and evidence presented" and "in the absence of any showing of malice or knowledge of falsity or reckless disregard for the truth." But the court of appeals ruled that the district court's reliance on Richie was "misplaced." Maethner , 907 N.W.2d at 675. According to the court of appeals, " Richie is inapposite because it considered First Amendment restrictions on defamation claims against the media," whereas this case involves statements made by a private individual and "a nonprofit organization that was soliciting donations." Id. Therefore, the court of appeals concluded, Maethner's claims of defamation per se are "actionable without proof of actual damages." Id.
Someplace Safe asks us to reverse the court of appeals' ruling on damages and disavow any distinction between media and nonmedia defendants in defamation cases involving private individuals. Specifically, Someplace Safe and several amici organizations argue that First Amendment principles do not support affording the institutional press more protection than other speakers when making statements on matters of public concern. Further, they contend, determining who qualifies as a member of the media has become untenable with the rise of the internet and the decline of print and broadcast media.
In response, Maethner acknowledges that the First Amendment "is not in the sole province of the media." But, according to Maethner, the statements here do not implicate heightened constitutional considerations because they pertain to "a private spat" between him and his former wife *877 with "fairly limited publication" by nonmedia defendants. We agree with the parties that the inquiry is fundamentally about the nature of the speech, not just the identity of the speaker.
In Richie , we did rely on the fact that one of the defendants was a member of what may be considered traditional "media" in our discussion. 544 N.W.2d at 26. But we also noted that the matters at issue were ones of "public concern." Id. Richie was a reaction to the Supreme Court's announcement of constitutional limits for defamation cases brought by private individuals in Gertz v. Robert Welch, Inc. , 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). As we noted in Richie , Gertz involved a "media defendant." 544 N.W.2d at 25.
The "principal issue" in Gertz was "whether a newspaper or broadcaster" that publishes defamatory statements about a private individual "may claim a constitutional privilege against liability." 418 U.S. at 332, 94 S.Ct. 2997. The Court held that in defamation suits brought by private plaintiffs, (1) states may impose any standard of liability "so long as they do not impose liability without fault," id. at 347, 94 S.Ct. 2997 ; and (2) states may not permit the recovery of presumed damages without proof of actual malice, id. at 349, 94 S.Ct. 2997. According to the Court, this approach balances "the legitimate state interest in compensating private individuals for wrongful injury to reputation" with the "competing interest grounded in the constitutional command of the First Amendment." Id. at 348-49, 94 S.Ct. 2997.
A plurality of the Supreme Court later limited the Court's holding in Gertz -requiring proof of actual malice before a private individual may recover presumed damages- to circumstances in which the alleged defamatory statements involve matters of public concern. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. , 472 U.S. 749, 760-61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion). In Dun & Bradstreet , a construction contractor sued a credit reporting agency for erroneously reporting to third parties that the contractor had filed for bankruptcy. Id. at 751-52, 105 S.Ct. 2939. Stressing that matters of public concern are "at the heart of the First Amendment's protection," the plurality distinguished between defamatory statements involving matters of public concern and matters of essentially private concern. Id. at 758-59, 105 S.Ct. 2939 (citation omitted) (internal quotation marks omitted). The plurality explained that speech on matters of "purely private concern" does not constitute a "threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." Id. at 759-60, 105 S.Ct. 2939 (citation omitted) (internal quotation marks omitted). Therefore, citing "the reduced constitutional value of speech involving no matters of public concern," the plurality held that permitting the recovery of presumed damages "absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." Id. at 761, 763, 105 S.Ct. 2939.
Taking Gertz and Dun & Bradstreet together, the proper focus regarding the availability of presumed damages is not on the status of the defendant as a media or nonmedia defendant. Rather, the dispositive inquiry is whether the matter at issue is one of public concern. The fact that the defendant is a member of the media may be relevant to determining whether a matter is one of public concern, but it is not, as the court of appeals suggested, the dispositive inquiry.
*878 Although we did reference "the media" in announcing the legal rule in Richie for defamation actions that involve a matter of public concern, 544 N.W.2d at 26, neither the Supreme Court nor our court makes a media/nonmedia distinction in defamation cases brought by public officials or public figures.[6] For example, in a prior defamation case, we explained that "Minnesota affords to nonmedia defendants the same first amendment protection for criticism of public officials that it grants to the mass media." Britton v. Koep , 470 N.W.2d 518, 521 (Minn. 1991). The rule should not be different when the plaintiff is a private individual but the matter nonetheless raises an issue of public concern. We recognized this in Richie to a certain extent when, "[b]ecause [her] communication utilized the television media," we applied the same rule on presumed damages to the attorney defendant as we did to the media defendant. See 544 N.W.2d at 26 n.5.
Accordingly, it is the private or public concern of the statements at issue-not the identity of the speaker-that provides the First Amendment touchstone for determining whether a private plaintiff may rely on presumed damages in a defamation action. Because the First Amendment signifies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times , 376 U.S. at 270, 84 S.Ct. 710, the Supreme Court "has frequently reaffirmed that speech on public issues ... is entitled to special protection," Connick v. Myers , 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Consistent with these principles, we hold that a private plaintiff may not recover presumed damages for defamatory statements *879 involving a matter of public concern unless the plaintiff can establish actual malice.
2.
We turn next to the issue of whether the alleged defamatory statements here involve a matter of public concern. If the challenged statements do not involve a matter of public concern, then presumed damages are available if Maethner can establish that the challenged statements are defamatory per se. Conversely, if the challenged statements do involve a matter of public concern, then Maethner's defamation claims fail as a matter of law because he has not presented evidence of actual harm to reputation and he has not made a showing of actual malice.[7] Neither the district court nor the court of appeals specifically determined whether the statements pertain to a matter of private or public concern.
The Supreme Court has explained that speech involving a public concern "falls within the core of First Amendment protection," Engquist v. Or. Dep't of Agric. , 553 U.S. 591, 600, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008), in order to assure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Dun & Bradstreet , 472 U.S. at 759, 105 S.Ct. 2939 (citations omitted) (internal quotation marks omitted). To determine whether the speech involved a matter of public or private concern in Dun & Bradstreet , the Court considered the "content, form, and context" of the speech "as revealed by the whole record." 472 U.S. at 761, 105 S.Ct. 2939 (citation omitted) (internal quotation marks omitted). After considering these factors, the Court held that a credit report about a construction contractor-a credit report that was "made available to only five subscribers"-involved "no public issue." Id. at 761-62, 105 S.Ct. 2939. The Court noted that the speech was "solely in *880 the individual interest of the speaker and its specific business audience." Id. at 762, 105 S.Ct. 2939. In contrast, the Court indicated that the magazine article at issue in Gertz -accusing the plaintiff of being involved in an alleged Communist campaign to discredit a police officer-"involved expression on a matter of undoubted public concern." Dun & Bradstreet , 472 U.S. at 756, 105 S.Ct. 2939.
In prior defamation cases brought by private individuals, we have labeled speech as a matter of public concern without much discussion or explanation. For example, we concluded that a news report describing a felony arson trial and the out-of-court activities of the accused were "matters of 'undoubted public concern.' " Jacobson v. Rochester Commc'ns Corp. , 410 N.W.2d 830, 836 n.7 (Minn. 1987) (quoting Dun & Bradstreet , 472 U.S. at 756, 105 S.Ct. 2939 ). And we concluded that the "discussion of sexual abuse of children by their parents and legal recourse available to the abused child" in Richie were matters that were "certainly of public concern." 544 N.W.2d at 26.
Notwithstanding the importance of the distinction between a public concern and a private concern in determining the constitutional protections afforded to speech in tort actions, the Supreme Court has acknowledged that "the boundaries of the public concern test are not well defined." City of San Diego v. Roe , 543 U.S. 77, 83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). But the Court has "articulated some guiding principles." Snyder v. Phelps , 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). In Snyder , the Court explained that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community" or when the subject of the speech is "of general interest and of value and concern to the public." Id. at 453, 131 S.Ct. 1207 (citations omitted) (internal quotation marks omitted). But the Court made clear that the subject of the speech is not the only consideration. According to the Court, "[d]eciding whether speech is of public or private concern requires" an examination of "the 'content, form, and context' of that speech, 'as revealed by the whole record.' " Id. (quoting Dun & Bradstreet , 472 U.S. at 761, 105 S.Ct. 2939 ).
The facts of Snyder are particularly helpful in illustrating how to analyze whether statements are ones of public concern. Snyder arose out of a protest by members of the Westboro Baptist Church at a funeral for a soldier who was killed in the line of duty. Id. at 448, 131 S.Ct. 1207. The protestors picketed on public land, carrying signs that contained messages such as "God Hates the USA/Thank God for 9/11," "America is Doomed," "Fag Troops," "Thank God for Dead Soldiers," "Pope in Hell," and "Priests Rape Boys." Id. at 448, 454, 131 S.Ct. 1207. The father of the soldier brought state tort law claims against Westboro. Id. at 449-50, 131 S.Ct. 1207. After examining the relevant factors, the Court concluded that the content of the signs "plainly relate[d] to broad issues of interest to society at large, rather than matters of 'purely private concern.' " Id. at 454, 131 S.Ct. 1207 (quoting Dun & Bradstreet , 472 U.S. at 759, 105 S.Ct. 2939 ). The Court observed that the signs highlighted issues such as "the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy," which are "matters of public import." Id. According to the Court, "even if a few of the signs-such as 'You're Going to Hell' and 'God Hates You'-were viewed as containing messages related to [the soldier or his family] specifically, that would not change the fact that the overall *881 thrust and dominant theme of Westboro's demonstration spoke to broader public issues." Id.
The Court's examination was not limited to the subjects of the messages on the placards. The court also considered the context of the speech. The Court found it significant that Westboro had conveyed its views "in a manner designed ... to reach as broad a public audience as possible," id. , noting that the picketing took place "at a public place adjacent to a public street," id. at 456, 131 S.Ct. 1207. And even though the context of the speech was the funeral of an individual soldier, because there was no prior relationship or conflict between Westboro and the soldier, the Court was "not concerned" that "Westboro's speech on public matters was intended to mask an attack ... over a private matter." Id. at 455, 131 S.Ct. 1207.
Based on this guidance, we hold that the determination of whether speech involves a matter of public or private concern is based on a totality of the circumstances. Specifically, courts should consider the content, form, and context of the speech. No single factor is "dispositive;" rather, courts should "evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." Id. at 454, 131 S.Ct. 1207.
In this case, Someplace Safe and Jorud focus on the subject of the challenged statements. They maintain that speech relating to domestic violence involves a matter of public concern. We do not disagree as a general proposition. But the form and the context of the speech must also be considered, as well as any other relevant factors. In addition to claiming that the statements here relate to a private matter between former spouses, Maethner has stressed the limited publication in this case-"within a fairly small area, in and around Otter Tail County"-and that the statements were made by an individual and organization that do "not engage in mass media communications."
Although we have clarified that the media- versus nonmedia-defendant distinction is not in and of itself determinative as to whether a private defamation plaintiff must establish actual harm to reputation in Minnesota, the distinction may have relevance in analyzing whether the challenged statements involve a matter of public concern. For example, the Supreme Court has explained that "[s]peech deals with matters of public concern" when the speech relates to " 'a subject of legitimate news interest.' " Snyder , 562 U.S. at 453, 131 S.Ct. 1207 (quoting City of San Diego , 543 U.S. at 83-84, 125 S.Ct. 521 ); cf. Bowman v. Pulaski Cty. Special Sch. Dist. , 723 F.2d 640, 644 (8th Cir. 1983) (stating that "media coverage" is "a good indication of the public's interest"). Similarly, the Eighth Circuit has stressed "[t]he importance of journalistic freedom in investigating and reporting on matters of public interest." Schuster v. U.S. News & World Report, Inc. , 602 F.2d 850, 853 (8th Cir. 1979). Therefore, courts may consider dissemination of the statements in the news media as one of many relevant factors in determining whether the statements involve a matter of public concern.
In the summary judgment proceedings below, the district court did not specifically decide whether the challenged statements involved a matter of public concern. The court of appeals did not reach this issue either. Accordingly, we remand to the district court to decide in the first instance whether the challenged statements involve a matter of public or private concern. See, e.g. , Capistrant v. Lifetouch Nat'l Sch. Studios, Inc. , 916 N.W.2d 23, 31 (Minn. 2018) (remanding to the district court to decide whether the occurrence of a condition precedent was material to the agreement *882 where "the district court did not make any findings on materiality").
II.
The last issue we must resolve relates to negligence. In Count III of his complaint, Maethner alleged a negligence claim against Someplace Safe separate from his defamation claim. The district court held that Someplace Safe did not have a duty to investigate Jorud's statements before publishing them and dismissed Maethner's negligence claim. On appeal, the court of appeals concluded that (1) Someplace Safe owed a duty to exercise reasonable care in investigating Jorud's statements before issuing a press release or publishing her statements, and (2) "[w]hether Someplace Safe breached its duty of reasonable care raised a fact question for the jury." Maethner , 907 N.W.2d at 673-74. The court of appeals also noted that "case law requires Maethner to prove negligence as one element of his defamation claim against Someplace Safe and Maethner does not have a separate negligence claim." Id. at 673.
Maethner does not challenge the dismissal of his negligence claim, Count III of his complaint, and so that issue is not before us. Maethner also does not challenge the court of appeals' conclusion that he must prove negligence as an element of his defamation claim.[8] But Someplace Safe challenges the court of appeals' conclusion that there is a jury issue on negligence. Specifically, we granted Someplace Safe's request to review whether "non-profit victims' advocacy organizations owe alleged abusers a duty to investigate before referring to alleged victims as 'survivors' and publishing survivors' statements about their personal experiences." For his part, Maethner argues that "Someplace Safe may be found liable as purveyor of the 'SURVIVOR AWARD' and defamatory statements in [its] newsletter."
In Jadwin v. Minneapolis Star & Tribune Co. , we held that "a private individual may recover actual damages for a defamatory publication upon proof that the defendant knew or in the exercise of reasonable care should have known that the defamatory statement was false." 367 N.W.2d 476, 491 (Minn. 1985). We explained that the conduct of the defendant "will be judged on whether the conduct was that of a reasonable person under similar circumstances." Id. We specifically "accept[ed] the Restatement position that '[c]ustoms and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though custom is not controlling.' " Id. at 491-92 (quoting Restatement (Second) of Torts § 580B cmt. g (Am. Law. Inst. 1976)).
The parties agree that Jadwin applies but they dispute the scope of the duty applicable to Someplace Safe and whether Someplace Safe breached that duty.[9]
*883 Someplace Safe claims that it "acted as any reasonable victims' advocacy group would act." Maethner contends that due care means, at a minimum, some reasonable effort to verify what is being published.
To the extent Someplace Safe argues that victims' advocacy organizations can never have a duty to investigate, we reject that argument. Rather, under Jadwin , Someplace Safe's duty was to act as a "reasonable person under similar circumstances" would act. 367 N.W. 2d at 491. Under the circumstances of this case, however, we conclude that there is no dispute of material fact regarding whether Someplace Safe breached that duty. The record indicates that Someplace Safe believed Jorud's statements to be true based on its interactions with her. And there is no evidence that Someplace Safe had reason to question Jorud's honesty or credibility.[10]
But, Maethner argues, Someplace Safe had a duty to conduct an investigation into the accuracy of Jorud's statements before designating her a "survivor" of domestic abuse, through the presentation of the "Survivor Award," and publishing Jorud's story in its newsletter. Maethner looks to the standard that courts have applied to professional publishers and news organizations in claiming that Someplace Safe has a duty to investigate. See , e.g. , Mahnke v. Nw. Publ'ns, Inc. , 280 Minn. 328, 160 N.W.2d 1, 10-11 (1968) (concluding that a jury could have reasonably found a newspaper publisher negligent in publishing an article containing "an array of false statements" without attempting to contact individuals with knowledge of the matter). We said in Jadwin , however, that the "customs and practices within the profession are relevant in applying the negligence standard" although not necessarily controlling.[11] 367 N.W.2d at 491-92. Beyond mere *884 assertions that Someplace Safe had a duty to investigate, Maethner has not offered any evidence to create an issue for trial. Specifically, he has not offered proof that a reasonable person in the circumstances here would have investigated Jorud's statements or that the relevant customs and practices of non-profit, victim-advocacy organizations are to investigate the accuracy of statements made by a person who sought services from that organization.
To the extent that there is evidence in the record on this question, the evidence is to the contrary. Someplace Safe provided testimony that it did not investigate Jorud's statements because she had used the services of the organization and nothing in her statements caused Someplace Safe "to believe that she was untruthful or lying." Moreover, testimony in the record shows that victims of domestic violence often do not have police records, witnesses, or photographs that verify their abuse. And, according to a representative of Someplace Safe, "This is a very private situation .... Many cases there's nothing. There's just a victim's word and the perpetrator's word." In sum, the evidence in the record shows that Jorud and Someplace Safe had a preexisting relationship and that, from that relationship, Someplace Safe had no reason to question the accuracy of Jorud's accounting of her history of suffering domestic abuse.
In the face of this evidence, Maethner cannot survive summary judgment by simply resting on his assertions that there was a duty to investigate. See DLH, Inc. v. Russ , 566 N.W.2d 60, 71 (Minn. 1997) (noting that "the party resisting summary judgment must do more than rest on mere averments" and that "there is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue"); Nicollet Restoration, Inc. v. City of St. Paul , 533 N.W.2d 845, 848 (Minn. 1995) (stating that "general assertions" are "not sufficient to create a genuine issue of material fact for trial"). To create an issue for trial on the breach question, Maethner needed to submit evidence to support the conclusion that a reasonable person in the position of Someplace Safe would have investigated or had reason to doubt Jorud's credibility. Maethner offered no such evidence. Based on the evidence in the record, the court of appeals erred in concluding that there is "a fact question for the jury" on whether Someplace Safe breached its duty of reasonable care.[12] Maethner , 907 N.W.2d at 674.
*885 Because the parties do not dispute that the negligence standard from Jadwin applies and Maethner cannot establish that Someplace Safe breached a duty, we reverse the court of appeals and reinstate the district court's dismissal of Maethner's defamation claim against Someplace Safe.
CONCLUSION
For the foregoing reasons, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.
Concurring in part and dissenting in part, Thissen, J.
Concurring, Anderson, J.
CONCURRENCE & DISSENT
THISSEN, Justice (concurring in part, dissenting in part).
I concur in the court's decision to remand respondent Kurt Maethner's defamation claim against appellant Jacqueline Jorud to the district court to determine whether the allegedly defamatory statements about Maethner involve a matter of public or private concern. I respectfully dissent, however, from the court's conclusion that no material factual questions exist about whether appellant Someplace Safe, Inc. acted with reasonable care before publishing the allegedly defamatory statements.[1] I would remand to the district court to allow a jury to resolve that issue.
The court holds that no reasonable juror could conclude that Someplace Safe should have made some effort to check on the accuracy of Jorud's public statements that Maethner abused her[2] before publicly spreading those statements to a broader audience as part of a fundraising and public advocacy effort. I disagree. The court's conclusion is inconsistent with our liberal summary judgment standard and reflects an unwarranted fear that Minnesota jurors cannot sort through difficult facts and apply the law fairly and justly.
The legal standard in this case is clear: Would a reasonable person exercising due care under the circumstances believe that the communication was true? As a general matter, we have said that "[n]egligence is the failure to exercise the level of care that *886 a person of ordinary prudence would exercise under the same or similar circumstances." Fenrich v. The Blake School , 920 N.W.2d 195, 201 (Minn. 2018) (citation omitted) (internal quotation marks omitted). Disputes over whether a breach of a duty of care occurred are typically questions we leave for a jury to resolve. See Domagala v. Rolland , 805 N.W.2d 14, 28-29 (Minn. 2011) ("Whether a defendant's chosen course of action satisfies the duty of reasonable care is a question for the jury."); see also Canada ex rel. Landy v. McCarthy , 567 N.W.2d 496, 505 (Minn. 1997) ("The question of negligence is ordinarily a question of fact and not susceptible to summary adjudication."). Moreover, when reasonable persons differ as to whether a duty of care was breached, summary judgment is inappropriate. See Henson , 922 N.W.2d at 190 ; Montemayor v. Sebright Prods., Inc. , 898 N.W.2d 623, 628 (Minn. 2017).
The negligence standard for defamation cases is no different. The standard is well-stated in the Restatement (Second) of Torts § 580B cmt. g (Am. Law Inst. 1977):
Negligence is conduct that creates an unreasonable risk of harm. The standard of conduct is that of a reasonable person under like circumstances. Insofar as the truth or falsity of the defamatory statement is concerned, the question of negligence has sometimes been expressed in terms of the defendant's state of mind by asking whether he had reasonable grounds for believing that the communication was true. Putting the question in terms of conduct is to ask whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it .... If the defendant is an ordinary citizen [and not a professional disseminator of news], customs of the community as a whole may be relevant.
(Emphasis added) (citations omitted). We adopted this negligence standard in 1985 and explicitly referenced comment g while doing so. See Jadwin v. Minneapolis Star & Tribune Co. , 367 N.W.2d 476, 491-92 (Minn. 1985) (adopting negligence standard of Restatement (Second) of Torts § 580B and noting that while "[c]ustoms and practices within the profession are relevant in applying the negligence standard," the "custom is not controlling " (emphasis added) (citation omitted) (internal quotation marks omitted)).[3]
*887 Someplace Safe made no effort to check or confirm whether the communications were true or false before communicating that Jorud survived abuse by Maethner. Indeed, Someplace Safe employees stated that the organization did not care whether Jorud's claims of abuse were true, accurate, or complete. Accordingly, a central question to be resolved in this case is whether Someplace Safe's decision to forego any investigation into the truth or falsity of its communications stating that Jorud survived abuse by Maethner before publishing them was reasonable.
I.
Someplace Safe makes several arguments for why the question of the reasonableness of its conduct need not go to a jury. I address each in turn.
A.
First, Someplace Safe argues that the challenged statements are protected by a qualified privilege. Specifically, Someplace Safe asserts that these statements are entitled to a qualified privilege because Someplace Safe published the statements to raise awareness of domestic violence and the services provided by the organization. Maethner responds that the statements are not protected by a qualified privilege simply because "domestic abuse is a matter of 'public interest.' " According to Maethner: "Merely because it has a worthwhile mission, an organization is not entitled to say whatever it wants, without reasonable cause, or any cause at all, trampling over the rights and reputations of others."
Our "doctrine of privileged communication rests upon public policy considerations." Lewis v. Equitable Life Assurance Soc'y of the U. S. , 389 N.W.2d 876, 889 (Minn. 1986). In order "to be protected by a qualified privilege, the statement must be made in good faith and 'must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause.' " Bol v. Cole , 561 N.W.2d 143, 149 (Minn. 1997) (quoting Stuempges v. Parke, Davis & Co. , 297 N.W.2d 252, 256-57 (Minn. 1980) ). A "qualified privilege bars liability only if the 'defamatory statements are publicized in good faith and without malice.' " Minke v. City of Minneapolis , 845 N.W.2d 179, 182 (Minn. 2014) (quoting Matthis v. Kennedy , 243 Minn. 219, 67 N.W.2d 413, 416 (1954) ). Whether a qualified privilege protects speech is a question of law which we review de novo. Lewis , 389 N.W.2d at 889.
An examination of cases where we have recognized a qualified privilege is helpful to determine whether we should extend the privilege here. One of the most common contexts lies in the employment arena-for example, when employers screen job applicants, investigate employee misconduct, or terminate employees for wrongdoing. Specifically, we have held that a qualified privilege protects an employer's good faith statements about the character of a past employee when called for a reference;[4] statements made in the course of an employer's investigation into employee *888 misconduct;[5] and statements regarding the reasons for an employee's discharge.[6] Similarly, we have held that a qualified privilege protected a bank that gave a negative credit reference to another potential lender. See Froslee v. Lund's State Bank of Vining , 131 Minn. 435, 155 N.W. 619, 620 (1915). We also have applied a qualified privilege to the statements of a psychologist and mental health center where the purpose of the statements was to protect a child from further abuse. Bol , 561 N.W.2d at 150. In each of these cases, a qualified privilege applied because we determined that the "statements ... should be encouraged despite the risk that the statements might be defamatory." Id. at 149 (citation omitted) (internal quotation marks omitted).
Bol provides a good illustration. There, a therapist reported to a child's mother the fact of the child's abuse and the identity of the perpetrator. Id. at 145. We recognized that the report at issue was made in an effort to prevent the child from suffering further abuse, undoubtedly upon a proper occasion and for a proper purpose, and so a qualified privilege applied. Id. at 149-50 ; see also McBride v. Sears Roebuck & Co. , 306 Minn. 93, 235 N.W.2d 371, 374 (1975) ("Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees."); Otto v. Charles T. Miller Hosp. , 262 Minn. 408, 115 N.W.2d 36, 39 (1962) (concluding that a hospital's explanation to the plaintiff, in front of a union steward who the plaintiff brought to the meeting, that the plaintiff's employment was terminated because the arson squad identified her as suspect in the arson was protected by qualified privilege and explaining that "[t]he hospital had a duty to take proper notice of the report of the arson squad and was required to deal with the fire hazards immediately and summarily").
I reach a different conclusion in this case. The statements here were not made on a "proper occasion" as our qualified privilege precedent requires. Bol , 561 N.W.2d at 149. The statements at issue were not communicated in order to prevent further domestic abuse; the statements were about matters that happened in the past. And while I agree with Someplace Safe that there is a strong public interest in raising awareness of domestic violence and empowering victims of such violence,[7] the statements at issue here did much more than that.
*889 Because we are reviewing the district court's grant of summary judgment, we must construe the evidence in the light most favorable to Maethner. 328 Barry Ave., LLC v. Nolan Props. Grp., LLC , 871 N.W.2d 745, 751 (Minn. 2015) ; Bol , 561 N.W.2d at 146. Doing so requires that we view the statements as accusing Maethner of committing the crimes of stalking and domestic assault against his former wife during their marriage. See Minn. Stat. §§ 609.749 (listing elements of stalking), .2242 (listing elements of domestic assault) (2018). That marriage was dissolved more than three years before the statements at issue were made. And there is no evidence or even any argument that the statements were made so that Jorud could escape ongoing violence. Someplace Safe's publication of Jorud's statements of past abuse therefore are unlike the statements at issue in Bol .
Moreover, Jorud's statements were not made to law enforcement or as part of an investigation of potential criminal activity. Cf. McBride , 235 N.W.2d at 374 (concluding that statements made as part of employer's investigation of employee theft were protected by qualified privilege). Outside of the context of Bol , where the statements of past criminal behavior were made in order to prevent future criminal behavior, or in the context of an investigation of potential criminal behavior, such as McBride , we have not afforded a qualified privilege to statements that accuse the plaintiff of past criminal behavior.
Finally, there is no evidence to suggest that the statements at issue were made to facilitate the provision of services to a domestic violence victim. Someplace Safe has ample room to advocate for and empower victims without publicizing accusations that an identifiable person has engaged in criminal behavior.
For all these reasons, the statements at issue were not made on a "proper occasion" as our qualified privilege precedent requires. See Bol , 561 N.W.2d at 149. Consequently, I conclude that a qualified privilege does not apply to protect the statements at issue.
B.
Someplace Safe next argues that the customs and norms of victims' advocacy organizations-specifically, that victims' advocacy organizations do not question the veracity of the victims they assist-should set as a matter of law the standard of care that victims' advocacy organizations owe in determining whether to publish potentially defamatory statements.[8] Someplace Safe *890 urges us to hold that a victims' advocacy group never needs to investigate whether a victim is telling the truth before republishing the victim's statement.[9]
The court correctly rejects this argument. For over a century we have said that "[t]he observance of a custom or failure to observe it does not necessarily amount to due care or lack of it, but such evidence is admissible as tending to show what a reasonably prudent person would do under the same or similar circumstances." Schmidt v. Beninga , 285 Minn. 477, 173 N.W.2d 401, 408 (1970) (citing Kelly v. S. Minn. Ry. Co. , 28 Minn. 98, 9 N.W. 588, 588 (1881) ). However, we noted that "[a]t the same time it must be recognized that the doing of a negligent act is not excused by the fact that it is customary. " Id. (emphasis added); see Anderson v. Fielding , 92 Minn. 42, 99 N.W. 357, 358 (1904) ("The law of this state is that a negligent act will not be excused by the fact that it is customary."). Someplace Safe's argument that it is entitled to a conclusive presumption in a defamation action that what a victim reports is true runs afoul of this basic principle of our longstanding negligence jurisprudence.
C.
Someplace Safe also contends that it had no duty as a matter of law to investigate the truth of its communications that Jorud was a victim of domestic abuse by Maethner because Jorud was a reputable source and Someplace Safe had no reason to doubt the truth of her statements. The court correctly declines to adopt such an extension of our limited reputable-source precedent.
We have held that a source of information may be so reputable that others who republish statements made by the source have no legal duty to take any independent steps to confirm the accuracy of the source's statement. Stated another way, this court (at least implicitly) has recognized narrow circumstances where it is reasonable as a matter of law for a person to rely on the accuracy of a reputable source's statement.
For example, in Church of Scientology of Minnesota v. Minnesota State Medical Association Foundation , we held that the Minnesota State Medical Association had no duty as a matter of law to confirm the accuracy of an article published in the American Medical Association magazine before passing the article along to a state agency in response to a request for information from the state agency for information about the Church of Scientology. 264 N.W.2d 152, 156 (Minn. 1978). We noted that the American Medical Association was broadly "known to be reputable" such that the act of republishing the article was "analogous to [the act] of a library or news vendor" that places books on its shelves or publishes copies of the local paper. Id. ; see Cole v. Star Tribune , 581 N.W.2d 364, 368-69 (Minn. App. 1998) (holding that a newspaper that republished a story from a reputable wire service like the Associated Press has no duty to verify the accuracy of the AP wire report). In those cases, the information was supplied not by an individual, but by a professional organization. The professional organization had no personal *891 stake in the subject of the information. Further, the professional organization had substantial investigative or research resources, a business and professional incentive to provide accurate information, and a longstanding reputation for expertise in its field.
None of those indicia of reliability exist in this case. Instead, Someplace Safe urges what amounts to a rule of law that a person's report about a previous relationship that raised no "red flags" about the person's honesty or credibility is all that is required to be deemed a reputable source who may be relied upon as accurate as a matter of law. Such a significant broadening of the reputable-source rule concerns me deeply. Under such a new rule, it appears that I could-with legal impunity-post on Facebook that my neighbor was cheating on her husband or selling heroin simply because another long-term neighbor who had never given me reason to doubt his credibility told me it was so. The rule also would mean that a Chamber of Commerce leader could publicly accuse a union official of bribing workers to join the union simply because a long-time member in good standing of the Chamber of Commerce told him so.
That cannot be the law. Setting aside that a total lack of concern for the truth does not well serve public advocacy and discourse, the expansion of the reputable-source precedent throws off the careful balancing that our law historically has attempted to strike between two competing values. On the one hand, we value the right to speak freely about issues of concern. On the other hand, we equally value "the individual's right to the protection of his own good name [which] 'reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty.' " Gertz v. Robert Welch, Inc. , 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (quoting Rosenblatt v. Baer , 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring)). Consequently, I agree with the court of appeals that Someplace Safe's action in soliciting, publishing, and disseminating Jorud's article about her personal story is sufficiently different from republishing an article from a national medical advocacy organization or established wire service such that Someplace Safe should not be immunized as a matter of law from exercising a duty of care regarding the truth or falsity of its communications.[10]
II.
The court ultimately rests its decision on the determination that Maethner failed to *892 identify any evidence that would have put Someplace Safe on notice that Jorud's statements were false and defamatory. The court echoes the question that underlies Someplace Safe's argument: Even if Someplace Safe had a duty to investigate, what evidence would it have found that would have prompted a reasonable person to question the truth of Jorud's statements? The court holds that because there is no such evidence, Someplace Safe acted reasonably as a matter of law in unquestioningly relying on Jorud.
There is something compelling about that conclusion in the context of a defamation claim against a service provider to, and advocate for, victims of domestic abuse. Someplace Safe and amici persuasively note that due to the nature of and fear associated with an abusive relationship, there are often no witnesses to the abuse, and neutral sources of evidence like police reports often are unavailable in domestic abuse cases. In addition, the very act of probing into or questioning a victim's story itself raises a risk of revictimizing the victim-something an organization working on behalf of victims wishes to avoid. Courts have struggled with these very real dynamics of abuse for decades in the context of making sure that our justice system delivers on its fundamental promise that abuse victims (just like every party) get a fair hearing. See State v. Wermerskirchen , 497 N.W.2d 235, 240-42 (Minn. 1993) (holding that prior uncharged acts of sexual abuse are admissible as relevant to the issue of whether the charged act of sexual abuse occurred); State v. Hennum , 441 N.W.2d 793, 798-99 (Minn. 1989) (holding that expert testimony regarding battered woman syndrome is admissible); see also State v. Glowacki , 630 N.W.2d 392, 401 (Minn. 2001) (justifying a rule of law that a person has no duty to retreat from one's home premised in part on "the realities facing those persons, mostly women, living in situations of domestic violence").
Those same fundamental commitments to making sure every person gets a fair hearing lead me to the conclusion that the court incorrectly deprives Maethner of the chance to present his case against Someplace Safe to a jury.
First, embedded in the court's opinion is an assumption that Maethner bears the burden of coming forward with evidence that would have put Someplace Safe on notice that it should have done an investigation. I am not convinced that the question is so simple. Maethner undoubtedly bears the burden of proving that Someplace Safe acted unreasonably. But the court demands something more. It requires Maethner to identify objective "red flags" that would have put Someplace Safe on notice that it should check on the veracity of Jorud's statements in order to defeat summary judgment. In so doing, the court is already stepping in and weighing the evidence by assuming in the first instance that Jorud's statement is truthful, an issue that is of course hotly contested in the litigation. Without an assumption that Jorud's statement is true, the logic of the court's conclusion that no genuine issue of material fact exists on the question of the reasonableness of Someplace Safe's decision to unquestioningly believe Jorud falls apart.
Second, I disagree that the record is devoid of evidence that a reasonable juror could rely upon to find that a reasonable person in Someplace Safe's shoes would have done more investigation. The court ignores the crucial fact that Maethner himself denies the truth of Jorud's statements that he abused her. That is the heart of the entire litigation. And in a typical defamation case-take the earlier example of my Facebook post falsely accusing my neighbor of selling heroin simply based on *893 the word of another neighbor-there is no question that we would allow a jury to determine whether I acted reasonably in posting the information without first checking with my allegedly heroin-selling neighbor even if there was no other evidence in the record but her denial.[11] Indeed, a jury may conclude that I acted reasonably under the circumstances. The point is that assessing the reasonableness of my conduct would be for a jury to decide. The court chooses to depart from that common sense outcome in this case without articulating why.
Someplace Safe raises legitimate concerns about opening up the possibility that it may be negligent in speaking without first attempting to corroborate a victim's story. But those concerns must be weighed against Maethner's right to get a fair hearing on his claim. Further, Someplace Safe's concern about revictimization and the limitations a corroboration requirement might impose on the organization's ability to do its work must be assessed in context, a role that is particularly well suited to a jury. See Restatement (Second) of Torts, § 580B, cmt. h (Am. Law Inst. 1977) ("The thoroughness of the check that a reasonable person would make before he published the statement may vary with the play of [various] factors. The standard of care does not change, but its application may vary with the circumstances.").
Here, Someplace Safe's allegedly defamatory statements were not made in the course of providing direct victim's services to Jorud. Rather, the statements were made for fundraising and general public advocacy purposes. Consequently, Someplace Safe did not face a binary choice: publish Jorud's statements without checking on their veracity or check on the veracity of the statements while running the risk of revictimizing Jorud and empowering Maethner. Instead, Someplace Safe could have chosen to use a different story entirely for its fundraising and public advocacy efforts. See id. (stating that one consideration in assessing whether a person acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it is "[h]ow necessary was this communication to these recipients in order to protect the interest involved" and noting that "[i]f there was no substantial interest to protect in publishing the communication to these recipients, then a reasonable person would be hesitant to publish the communication unless he had good reason to believe that it was accurate").[12] A jury should be allowed to weigh those considerations.
*894 Further, the court's decision to overlook Maethner's denial of the allegations imposes on Maethner an impossible task precisely because domestic abuse so often leaves few evidentiary traces. Perhaps unsurprisingly given the dynamics of abuse, Jorud acknowledged that there is no evidence aside from her word that Maethner abused her. Jorud never reported abuse to the police and there is no mention of abuse in the record of Maethner and Jorud's divorce. By establishing a rule that requires a person in Maethner's position to point to objective, independent evidence of abuse that in most cases does not exist, the court is establishing de facto legal immunity from defamation suits for organizations like Someplace Safe.[13] I cannot concur in that outcome.
III.
By concluding that a remand would be appropriate, I do not pass judgment on whether it was reasonable for Someplace Safe to unquestioningly accept that Jorud's statements were true. Nor do I suggest that Someplace Safe's policy arguments-about the custom, practice, and ethic that victims' advocacy organizations believe victims, the dynamic of revictimization, the frequent lack of objective evidence of domestic abuse, or the organization's belief that it had no reason to disbelieve Jorud-would not be powerfully persuasive to a jury. It is absolutely appropriate for Someplace Safe to ask a jury to consider those arguments when assessing whether a reasonable person in Someplace Safe's position should have tried to confirm whether Maethner in fact abused Jorud. See Schmidt , 173 N.W.2d at 408 (noting that evidence of industry custom is relevant-although not dispositive-to establish what a reasonably prudent person would do under the same or similar circumstances).
The essential point is that reasonable minds may differ as to whether a reasonably prudent person under the circumstances would have taken further (or any) steps to investigate Jorud's statements. See Henson , 922 N.W.2d at 190. Under such circumstances, summary judgment is too blunt an instrument. See Montemayor , 898 N.W.2d at 628. I trust the capacity of Minnesota jurors to sort through the factual issues raised in this case, including broader considerations about the dynamics of domestic abuse and the role of victims' advocacy organizations in responding to abuse fairly and responsibly. See Wilkerson v. McCarthy , 336 U.S. 53, 62, 69 S.Ct. 413, 93 L.Ed. 497 (1949) ("Courts should not assume that in determining these questions of negligence juries will fall short of a fair performance of their constitutional *895 function.") Indeed, cases like this where shifting and contested cultural, political, and social norms are at issue are much better suited to determination by a jury as an institution of democratic deliberation rather than determination by judicial fiat.[14] See Jenny Carroll, The Jury as Democracy , 66 Ala. L. Rev. 825, 829-32 (2015) ; Vikram David Amar, Jury Service as Political Participation Akin to Voting , 80 Cornell L. Rev. 203, 218-46 (1995). Because disputed questions of material fact exist as to whether Someplace Safe acted reasonably in failing to take any steps to confirm whether Jorud's statements that Maethner abused her were true, I dissent from the court's conclusion that Someplace Safe is entitled to judgment as a matter of law.
CONCURRENCE

Someplace Safe sought affirmance in the court of appeals on multiple grounds, including the ground that the allegedly defamatory statements were not about Maethner. The court of appeals did not consider this issue, noting that Someplace Safe "failed to file a notice of related appeal on this issue, which was decided adversely below." Maethner v. Someplace Safe, Inc. , 907 N.W.2d 665, 667-68 (Minn. App. 2018). The issue of whether the statements were about Maethner is therefore not before us.

Truth is a complete defense to a defamation claim. Stuempges v. Parke, Davis & Co. , 297 N.W.2d 252, 255 (Minn. 1980). In this case, however, the parties agree that the truthfulness of the statements cannot be resolved on summary judgment.

There is no claim here that Maethner is a public official or public figure.

Someplace Safe also appealed the court of appeals' determination that a qualified privilege does not apply. Because, as explained below, we resolve the negligence question in favor of Someplace Safe, it is not necessary for us to reach the question of Someplace Safe's qualified-privilege defense.

Jorud asks us to abolish the doctrine of defamation per se in Minnesota and "always require proof of actual damages to reputation" in defamation cases. She argues that requiring proof of actual damages "reconciles defamation jurisprudence" with the legal standards governing other types of tort claims. Further, she argues, defamation per se is a concept inherited from English ecclesiastical courts that no longer offers a meaningful distinction between different types of defamation. But "[w]e are extremely reluctant to overrule our precedent absent 'a compelling reason.' " Schuette v. City of Hutchinson , 843 N.W.2d 233, 238 (Minn. 2014) (quoting State v. Martin , 773 N.W.2d 89, 98 (Minn. 2009) ). Jorud has not presented us with a substantial or compelling reason to abolish the doctrine of defamation per se. Reputational damage logically flows from defamation, even if difficult to prove. And the potential harm to an individual's reputation is substantial in the types of statements that the doctrine of defamation per se encompasses. We have declined to abolish defamation per se in the past, see Becker v. Alloy Hardfacing & Eng'g Co. , 401 N.W.2d 655, 661 (Minn. 1987), and we decline to do so now.

In a case that preceded Dun & Bradstreet -a case involving a private individual who brought an action against his prior employer for making defamatory statements about his work record-we stated that "we believe that Gertz ... applies only to media defendants." Stuempges v. Parke, Davis & Co. , 297 N.W.2d 252, 258 n.5 (Minn. 1980).
Stuempges was cited in Dun & Bradstreet as one of the cases illustrating the "disagreement among the lower courts about when the protections of Gertz apply." 472 U.S. at 753 & n.1, 105 S.Ct. 2939. In Dun & Bradstreet , although the Vermont Supreme Court had ruled that Gertz did not apply in a private plaintiff "nonmedia" defamation case, the Supreme Court affirmed for a different reason, holding that the recovery of presumed damages "in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." Id. at 763, 105 S.Ct. 2939. Nonetheless, as other courts have observed, "five members of the Court expressly rejected a distinction between media and nonmedia defendants" in Dun & Bradstreet . Garcia v. Bd. of Educ. of Socorro Consol. School Dist. , 777 F.2d 1403, 1409 (10th Cir. 1985) ; see Dun & Bradstreet , 472 U.S. at 782-83, 105 S.Ct. 2939 (Brennan, J., dissenting) (describing a "media/nonmedia distinction" as "irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of its source' " (quoting First Nat'l Bank of Boston v. Bellotti , 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) )); id. at 773, 98 S.Ct. 1407 (White, J., concurring in judgment) (agreeing with the dissent that "the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech").
In a subsequent private plaintiff defamation case, however, the Supreme Court specifically declined to decide whether suing a nonmedia defendant makes a difference. Phila. Newspapers, Inc. v. Hepps , 475 U.S. 767, 779 n.4, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (stating that the Court did not need to consider the burden of proof on falsity that "would apply if the plaintiff sues a nonmedia defendant" in a private plaintiff/public concern case). But cf. Citizens United v. Fed. Election Comm'n , 558 U.S. 310, 326, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (declining to draw "constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker").

The district court concluded that summary judgment was appropriate, in part, because Maethner had presented "no substantive evidence" of actual malice. As noted above, actual malice requires proof "that the declarants spoke with the knowledge that their statements were false or with reckless disregard as to whether the statements were false or not." Weinberger v. Maplewood Review , 668 N.W.2d 667, 673 (Minn. 2003). Whether evidence in the record is sufficient to support a finding of actual malice is a question of law. Diesen v. Hessburg , 455 N.W.2d 446, 453-54 (Minn. 1990) (citing Harte-Hanks Commc'ns, Inc. v. Connaughton , 491 U.S. 657, 685, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ).
Maethner raised the issue of actual malice on appeal, but the court of appeals did not reach the issue. In our court, Maethner bases his claim of actual malice on "[t]he total absence of any effort by Someplace Safe to investigate, and its self-imposed blindness for any corroboration of even the most minimal sort of [Jorud's] accusations." We have held, however, that the "mere failure to investigate" is "not dispositive of actual malice"; rather, "to meet the actual malice standard, '[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " Chafoulias v. Peterson , 668 N.W.2d 642, 655 (Minn. 2003) (alteration in original) (quoting St. Amant v. Thompson , 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ). Maethner's allegations that Someplace Safe failed to investigate are therefore insufficient evidence of actual malice. With respect to Jorud, Maethner simply alleges "a lingering post-divorce marital animosity." But even if Maethner can produce evidence of Jorud's "ill will," that would not be sufficient to establish actual malice. Campbell v. Citizens for an Honest Gov't, Inc. , 255 F.3d 560, 569 (8th Cir. 2001) ; see also Moreno v. Crookston Times Printing Co. , 610 N.W.2d 321, 329 (Minn. 2000) (contrasting actual malice-a "knowing or reckless disregard for the truth or falsity of a statement"-with common law malice-"ill will or improper motive for the publication of defamatory statements"). We therefore conclude that Maethner has failed to establish actual malice as a matter of law.

Maethner stated in his brief to our court that his "defamation claim here is grounded on negligence, failure to exercise reasonable care, not strict liability."

Because Maethner is not challenging the court of appeals' conclusion that negligence is an element of his defamation claim against Someplace Safe, we assume without deciding that it is. But we also recognize that we have never applied the negligence standard from Jadwin in a defamation case that did not implicate First Amendment concerns. See, e.g. , Bahr v. Boise Cascade Corp. , 766 N.W.2d 910, 919-22 (Minn. 2009) (analyzing a defamation claim without discussion of negligence). Jadwin was a response to the Supreme Court's ruling in Gertz v. Robert Welch, Inc. , which held that states may impose any standard of liability for defamation actions brought by private plaintiffs "so long as they do not impose liability without fault." 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Eleven years after Gertz was decided, we adopted a negligence standard in Minnesota in Jadwin , 367 N.W.2d at 491. But shortly after our decision in Jadwin , a plurality of the Supreme Court limited the requirements of Gertz to cases involving matters of public concern. See Dun & Bradstreet v. Greenmoss Builders, Inc. , 472 U.S. 749, 763, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Since then, we have not revisited our holding in Jadwin . Because the parties in this case do not raise the issue, we reserve for another day the question of whether Jadwin requires private plaintiffs to prove negligence in all defamation cases, or whether that requirement is limited to defamation cases that involve matters of public concern.

Maethner relies on a letter that his mother sent to Someplace Safe to support his argument that Someplace Safe had reason to doubt the veracity of Jorud's statements. The letter is not in the record and we therefore cannot rely on it. See Plowman v. Copeland, Buhl & Co. , 261 N.W.2d 581, 583 (Minn. 1977) ("It is well settled that an appellate court may not base its decision on matters outside the record on appeal, and that matters not produced and received in evidence below may not be considered."). Moreover, even if we did consider the letter, the record, even when construed in the light most favorable to Maethner, does not support the conclusion that Someplace Safe entertained doubts about Jorud's credibility after it received the communication from Maethner's mother.

Custom and practice are not controlling because there could be circumstances when following the custom in the industry is not reasonable. The Restatement (Second) of Torts recognizes this:
No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, or money, to set its own uncontrolled standard at the expense of the rest of the community. If the only test is to be what has always been done, no one will ever have any great incentive to make any progress in the direction of safety. It follows, therefore, that whenever the particular circumstances, the risk, or other elements in the case are such that a reasonable [person] would not conform to the custom, the actor may be found negligent in conforming to it; and whenever a reasonable [person] would depart from the custom, the actor may be found not to be negligent in so departing.
Restatement (Second) of Torts § 295A cmt. c (Am. Law Inst. 1965). In this case, Maethner did not offer evidence to create an issue for trial on whether a reasonable person in the position of Someplace Safe would have done something other than adhere to the custom that Someplace Place followed.

The dissent mischaracterizes our decision on this issue. By agreeing that the district court properly dismissed Maethner's claim against Someplace Safe, we are not holding that victims' advocacy organizations never have a duty to check on the truth or falsity of defamatory statements before publishing them or that such organizations are entitled to a "legal presumption in a defamation action that what a victim reports is true." We are simply holding, based on the record before us, that Maethner has failed to put forth any evidence that creates a genuine dispute of material fact. The standard of care we announced in Jadwin remains the same, and we apply it to the circumstances of each case. Here, those circumstances involve a victims' advocacy organization providing services to victims of domestic abuse and that organization's publication of a newsletter describing its work. Our case law instructs us to consider these circumstances in determining whether there is a fact dispute. We have done so and determined that there is no dispute.
The dissent reaches the opposite conclusion based on Maethner's contention that the statements are false. But this conclusion conflates the negligence and falsity elements of a defamation claim. On the summary judgement question here, the issue is not whether the statements are false. The question is whether Someplace Safe "knew or in the exercise of reasonable care, should have known that the defamatory statement was false." Jadwin , 367 N.W.2d at 491. We conclude that no reasonable jury could find, based on the evidence in the record, that Someplace Safe knew or should have known Jorud's statements were false. Thus, summary judgment is appropriate.

I agree with the court's qualification in footnote 9 that the broader question of whether private plaintiffs must prove negligence in all defamation cases remains open.

Someplace Safe disputes whether the communications accuse Maethner (at least by name) of abusing Jorud. Because this case is before us on appeal from summary judgment, we must assume that a jury would read the communications as accusing Maethner of abusing Jorud. See Henson v. Uptown Drink, LLC , 922 N.W.2d 185, 190 (Minn. 2019) (noting that when reviewing a grant of summary judgment, "we view the evidence in the light most favorable to the nonmoving party ... and resolve all doubts and factual inferences against the moving part[y]" (citation omitted) (internal quotation marks omitted)). Similarly, because of the procedural posture of the case, we must assume that the contested statements are actionable statements of fact and not opinions and that Maethner suffered reputational damage.

I agree with Someplace Safe that publishing a newsletter does not make it a professional disseminator of news. Someplace Safe is an "ordinary citizen" in the parlance of the Restatement and the customs of the community as a whole are relevant when assessing whether Someplace Safe acted reasonably. Accordingly, the specific Restatement position that we adopted in Jadwin -that an industry-specific negligence standard in defamation cases may be appropriate for reporters and professional disseminators of news like newspapers, magazines, and broadcast stations-does not apply. See 367 N.W.2d at 491 (citing Restatement (Second) of Torts, § 580B cmt. g) (adopting Restatement standard for professional disseminators of news and reporters in a case involving a major local newspaper); see also Mahnke v. Nw. Publ'ns, Inc. , 280 Minn. 328, 160 N.W.2d 1, 10-11 (1968) (concluding newspaper that published article about allegations of sexual abuse acted recklessly because it did not take reasonable steps to verify the facts before publication).
The application of a different standard of negligence for professional journalists is consistent with our approach to the duty of care in other professional malpractice cases where we have departed from a focus on "a person of ordinary prudence." In malpractice cases, we apply a heightened standard of care such that the "learning and experience of a [professional] in good standing in his profession must be incorporated into the definition of a reasonably prudent man." Larsen v. Yelle , 310 Minn. 521, 246 N.W.2d 841, 844 (1976) ; see Wartnick v. Moss & Barnett , 490 N.W.2d 108, 112-13 (Minn. 1992) (noting the standard of care for lawyers in a malpractice action); Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co. , 366 N.W.2d 271, 279 (Minn. 1985) (noting that whether an insurance agent's professional judgments were negligent is assessed against the standard of care an ordinary insurance agent would take in the performance of professional duties); Vernon J. Rockler & Co., Inc. v. Glickman, Isenberg, Lurie & Co. , 273 N.W.2d 647, 650 (Minn. 1978) (noting that an accountant must exercise the average ability and skill of those engaged in the accounting profession).

See Stuempges , 297 N.W.2d at 257 (holding that "an employer called upon to give information about a former employee should be protected so that he can give an accurate assessment of the employee's qualifications").

See Bahr v. Boise Cascade Corp. , 766 N.W.2d 910, 923 (Minn. 2009) (reasoning that a qualified privilege "extends to investigations of employee misconduct because 'the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees' " (quoting McBride v. Sears, Roebuck & Co. , 306 Minn. 93, 235 N.W.2d 371, 374 (1975) )).

See Lewis , 389 N.W.2d at 889-90 ; see also Frankson v. Design Space Int'l , 394 N.W.2d 140, 144 (Minn. 1986) (extending the employer's privilege to communicate the reason for discharge to communications between corporate employees who require the information to perform their job duties); Otto v. Charles T. Miller Hosp. , 262 Minn. 408, 115 N.W.2d 36, 40 (1962) (holding that the employer had a qualified privilege to communicate the reason for an employee's discharge in front of a union representative).

Legislatures in other states have enacted statutory privileges that prohibit defamation claims in the sexual harassment context. See, e.g. , Cal. Civil Code, § 47(c) (West 2019). And the Minnesota Legislature has enacted other laws that recognize the unique challenges of legal claims and issues involving domestic violence. See, e.g. , Minn. Stat. § 634.20 (2018) (making admissible evidence of past acts of domestic violence). But the Minnesota Legislature has not enacted a qualified privilege related to allegations of domestic abuse.

Someplace Safe argues that we should adopt a rule that domestic abuse victims' organizations should have no obligation as a matter of law to check on the veracity of the statements made by the victims they assist because such organizations are statutorily prohibited from disclosing information provided by victims. See Minn. Stat. § 13.05, subd. 3 (2018) ("Collection and storage of all data on individuals and the use and dissemination of private and confidential data on individuals shall be limited to that necessary for the administration and management of programs specifically authorized by the legislature or local governing body or mandated by the federal government."); Minn. Stat. § 611A.32, subd. 5 (2018) ("Personal history information and other information collected, used or maintained by a grantee from which the identity or location of any victim of domestic abuse may be determined is private data ...."); Minn. Stat. § 611A.371, subd. 3 (2018) ("Personal history information collected, used, or maintained by a designated shelter facility from which the identity or location of any battered woman may be determined is private data on individuals ...."). We need not decide that question in this case. The communications that are the subject of Maethner's defamation claims are based on statements Jorud herself made publicly in speeches and the newsletter, not on information Jorud provided privately to Someplace Safe in the course of seeking services from Someplace Safe.

The rule of law that Someplace Safe advocates-that it is entitled to judgment as a matter of law on Maethner's negligence claim due to custom and usage among victims' advocacy organizations-is a qualified privilege argument in disguise.

At the very least, a jury should be given the opportunity to assess whether the relationship between Jorud and Someplace Safe was sufficiently close and developed to justify Someplace Safe's absolute reliance on Jorud's credibility. See Montemayor , 898 N.W.2d at 633 (determining credibility is a "role properly reserved for the jury"). The record discloses that Someplace Safe assisted Jorud on a handful of occasions in the spring of 2010. In March 2010, Jorud discussed her fear of Maethner with a victim advocate at Someplace Safe. An advocate of Someplace Safe also assisted Jorud at her court hearing on March 24, 2010. Finally, Jorud reported to Someplace Safe in April 2010 that she did not feel safe at home and asked for help exploring legal options. Jorud did not contact Someplace Safe again after that conversation. But as noted earlier, the communications at issue in this case do not arise from Someplace Safe's provision of services to Jorud in 2010 as a victim of domestic abuse. Instead, Jorud was invited to speak at a Someplace Safe fundraising tea only after an employee of Someplace Safe heard her speak to a local Kiwanis Club in late 2013 or early 2014. The 2014 decision to give Jorud the Survivor Award and publish her story in its newsletter was based on her recent public speaking about surviving domestic abuse. This chronology at least gives rise to a jury question about the nature of the relationship.

The court suggests that this analysis conflates the falseness and negligence elements of a defamation claim. I disagree. The whole point of the court's conclusion is that Someplace Safe acted reasonably as a matter of law because there was no evidence that Jorud's statement was false. The evidence is that Maethner claims Jorud's statements were false, we must accept that claim as true, and thus the question of the reasonableness of Someplace Safe in not making any investigation should go to the jury.

The Restatement (Second) of Torts, § 580B, comment h, sets forth several useful factors that a court may consider "[i]n determining whether the defendant acted as a reasonable, prudent person under the circumstances in publishing the defamatory communication on the basis of his check or lack of check as to its accuracy and as to its defamatory character ...." Comment h states:
One factor is the time element. Was the communication a matter of topical news requiring prompt publication to be useful, or was it one in which time and opportunity were freely available to investigate? In the latter situation, due care may require a more thorough investigation. A second factor is the nature of the interests that the defendant was seeking to promote by publishing the communication. Informing the public as to a matter of public concern is an important interest in a democracy; spreading of mere gossip is of less importance. How necessary was this communication to these recipients in order to protect the interest involved? If there was no substantial interest to protect in publishing the communication to these recipients, then a reasonable person would be hesitant to publish the communication unless he had good reason to believe that it was accurate.
A third factor is the extent of the damage to the plaintiff's reputation or the injury to his sensibilities that would be produced if the communication proves to be false. Was the communication defamatory on its face? Would its defamatory connotation be known only to a few? How extensive was the dissemination? How easily might the plaintiff protect his reputation by means at his own disposal?
Id.

Standpoint, along with other amici curiae, points out that false reports of sexual assault are rare, ranging between 2 and 8 percent of all reports. The record does not disclose statistics for false reports of domestic assault more generally. Nonetheless, there are cases where a report is false, and I am not comfortable with a legal regime that prohibits those rare cases from getting a full hearing. I am afraid that is the outcome of the court's decision.

Someplace Safe does not rest its argument on constitutional provisions or principles. A constitutional argument would raise different considerations related to democratic deliberation.